**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

United States of America,    )  Criminal Action
                             )  No. 1:21-cr-00576-RC-1
            Plaintiff,       )
                             )
vs.                          )  **Bond Hearing** (via Zoom)
                             )
Floyd Ray Roseberry,         )  Washington, D.C.
                             )  **August 8, 2022**
            Defendant.       )  Time:  11:00 a.m.
_____

**Transcript of Bond Hearing** (via Zoom)
**Held Before
The Honorable Rudolph Contreras** (via Zoom)
**United States District Judge**


A P P E A R A N C E S

For the Government:     **Christopher T. Tortorice**
(via Zoom)              UNITED STATES ATTORNEY'S OFFICE
                        FOR THE DISTRICT OF COLUMBIA
                        601 D Street, Northwest
                        Washington, D.C. 20579

For the Defendant:      **Mary M. Petras**
(via Zoom)              FEDERAL PUBLIC DEFENDER FOR THE
                        DISTRICT OF COLUMBIA
                        625 Indiana Avenue, Northwest
                        Washington, D.C. 20004
_____

Stenographic Official Court Reporter:
(via Zoom)              Nancy J. Meyer
                        Registered Diplomate Reporter
                        Certified Realtime Reporter
                        333 Constitution Avenue, Northwest
                        Washington, D.C. 20001
                        202-354-3118

P R O C E E D I N G S

(REPORTER'S NOTE: This hearing was held during the COVID-19 pandemic restrictions and is subject to the limitations of technology associated with the use of technology, including but not limited to telephone and video signal interference, static, signal interruptions, and other restrictions and limitations associated with remote court reporting via telephone, speakerphone, and/or videoconferencing.)

THE COURTROOM DEPUTY: This is Criminal Action 21-576, United States v. Floyd Roseberry. For the United States, I have Christopher Tortorice. For defendant, I have Mary Petras. Also with us today is Dr. Teresa Grant. And our court reporter today is Nancy Meyer.

All parties are present.

THE COURT: Good morning, everybody. So we're here to continue on hearing the defendant's motion to -- to modify his conditions of release and have him released into some sort of supervision that doesn't involve detention.

So go ahead, Ms. Petras. Why don't you lead the way from here.

MS. PETRAS: Thank you, Your Honor.

I do have an update with regard to we have a scheduled appointment for continuing care, which I can explain afterwards, but I wanted to get right to Dr. Grant because she has very limited time.

The Court had asked -- Dr. Grant in her prior report had submitted that Mr. Roseberry at the time of the offense was on

1   medication that was contraindicated for his diagnosis.  The
2   Court had asked for additional information as to how those
3   medications would have affected Mr. Roseberry and impacted his
4   conduct at the time of the charged offenses.
5        So I turn it over to Dr. Grant to explain the
6   medications and how they would have negatively affected him at
7   that time.
8        Dr. Grant, can you just state your name for the record
9   and then go ahead and explain.
10           DR. GRANT:  Good morning, everybody.  Dr. Grant from
11   the Department of Behavioral Health.
12        I interviewed Mr. Roseberry when he was first in
13   custody.  And I want to qualify this by saying that I'm not a
14   psychiatrist.  I don't prescribe meds.  However, I've worked in
15   two psychiatric hospitals and worked a lot with psychiatrists
16   on medications and what they -- and their purpose in what they
17   do and what they don't do.
18        I was shocked at the medications that Mr. -- I actually
19   reached out to his wife prior to my evaluation and asked her to
20   give me a listing of his medications.  I was actually shocked
21   by two things.  One, the medications he was being prescribed
22   were not by a psychiatrist; and two, the medications that he
23   was prescribed, Adderall and Valium, are really contraindicated
24   for people who have like a borderline -- or like a bipolar
25   disorder.

1    So when you have a bipolar disorder, it's really
2    important that you are on a mood stabilizer, which I know he's
3    on right now.  But he was on Adderall, and he was also on
4    Valium.  Those are really serious drugs to give somebody who
5    has a bipolar disorder.  It can contribute to manic and/or
6    psychotic episodes.  And I think that that's exactly what
7    happened with Mr. Roseberry prior to him driving from
8    North Carolina to the Capitol on the day that he -- he came.
9    So I immediately started working with the psychiatrist
10   over at the jail and asked them to do some modifications to his
11   medications.  And I think the regimen that he's on right now,
12   he's been quite stable for quite a while, and the medications
13   are actually helping to keep him much more regulated.  I know
14   that he's not had a psychotic episode or mood-related episode
15   in months.  So that's the information that I wanted to
16   contribute to what possibly happened to him the day he became
17   manic and psychotic and drove from North Carolina to
18   Washington, D.C.
19   MS. PETRAS:  And then, Dr. Grant, if I could just ask
20   you, have you spoken to -- you mentioned speaking to and
21   working with the psychiatrist at the jail.  When you spoke to
22   the psychiatrist at the jail when Mr. Roseberry was first
23   detained and you were working on the competency issues, did the
24   psychiatrist indicate that he agreed with you with regard to
25   medications?

1    DR. GRANT: Yes. And he actually discontinued the
2    medications that he was prescribed in North Carolina, and we
3    started him on a whole new regimen here when he came to the
4    jail. Because he was on a mental health unit for quite a
5    while, and we watched him on the mental health unit. Even
6    though I had found him competent, I was still kind of --
7    because of his previous attorney -- monitoring Mr. Roseberry
8    and actually seeing him on, like, a weekly or biweekly basis to
9    make sure that the medicines were working, he wasn't having
10   side effects.
11        And if he experienced some issues, I was the go-between
12   between him and the psychiatrist to, say, hey, he'd like to
13   know if you can increase this, he's still having issues with
14   sleep. So I had, you know, worked with them, and we got him,
15   you know, where he is now; very, very stable. So I'm pleased
16   to see that he's doing well.
17        MS. PETRAS: And just for the record -- I should back
18   up for a moment -- can you just state your current position and
19   how long you've been there and what your responsibilities are.
20        DR. GRANT: Wow. You're going to make me show my
21   age.
22        I am the forensic psychologist assigned to the
23   Maryland -- I'm sorry -- D.C. Department of Behavioral Health,
24   and I conduct all of the evaluations at D.C. Superior Court,
25   and I'm the primary evaluator for district court.

1           MS. PETRAS:  Thank you.

2           THE COURT:  Mr. Tortorice, do you have any questions?

3           MR. TORTORICE:  No, Your Honor.  I don't have any
4    questions for -- for Dr. Grant.

5       Just maybe -- maybe not for evidentiary value, but I
6    consulted with my own personal expert in matters of psychiatry,
7    my wife, who's a psychiatric nurse practitioner, and showed her
8    the meds.  And what Dr. Grant said in terms of the
9    appropriateness is at least consistent with my personal expert.

10          THE COURT:  All right.  So, Dr. Grant, do you have
11   any sense of -- you know, to the extent I assess safety to the
12   public, do you assess that Mr. Roseberry, given the change in
13   medications, no longer presents a risk of having the same sort
14   of psychotic break or manic state that would cause him to do
15   something like that?

16          DR. GRANT:  I think that with the medications that
17   he's on right now -- one is a mood stabilizer, and he's done
18   quite well on it -- is Trileptal.  He's, actually, done very
19   well on that.  He's been on that medication for quite a while.

20       He's been moved from the mental health unit.  He's now
21   in a step-down unit, and I think that he -- the medications
22   that he's on now, if they're continued with the psychiatrist on
23   the outside -- and I'm stressing psychiatrist and not a family
24   practitioner who was helping him with his meds the last time --
25   I think that he would pose minimal risk.

1            And one of the things that I -- I could offer -- and I'm
2    not -- I know I'm stretching myself, but I'll do it -- I can
3    stay -- if he's released and he signs a release, I could
4    submit, like, monthly or weekly reports to the Court and let
5    them know, you know, how he's doing on his meds and he's
6    reporting to his appointments.
7            THE COURT:  All right.  I'll consider that.
8        All right.  Anyone else have any questions for Dr. Grant
9    before we release her?  No?
10            MS. PETRAS:  I don't.  Thank you, Dr. Grant.
11            MR. TORTORICE:  Nothing from the government.
12            (REPORTER'S NOTE:  Dr. Grant left the Zoom hearing.)
13            MS. PETRAS:  Your Honor, I did want to add one other
14   supplement to the record.  Ms. -- Mr. Roseberry's wife has
15   reached out to a psychiatrist.  It's not far from where they
16   live in Mooresville.  The psychiatrist is located in
17   Mooresville, North Carolina, and she's made an appointment for
18   him for August 16th at 4:00 p.m.
19        I then contacted the jail this morning to see when they
20   release an individual how much medication do they release him
21   with.  They confirmed for me that they would release him with
22   three days of medication.  So what our request would be is that
23   the Court release him as of next Monday, the 15th, and the
24   release order would be -- Monday, the 15th, and release him to
25   the custody of his wife, Ms. Roseberry, who will drive up here.

1   I think it's a different last name.  I apologize.

2          But his wife would drive up here, pick him up, take him

3   home, and then the following day he would see a psychiatrist,

4   not his family practitioner, as Dr. Grant mentioned -- his

5   psychiatrist -- and the psychiatrist would have the current

6   prescriptions to continue him on those medications.

7          We could also connect that psychiatrist with Dr. Grant.

8   And as Dr. Grant just indicated, she would be willing to stay

9   in touch with Mr. Roseberry and his wife and do monthly updates

10  for the Court.  We could also connect her with the psychiatrist

11  so that she could check in with him to ensure compliance as

12  well.

13         And on top of all of that, the Court could have him on

14  electronic monitoring and 24-hour home detention at his home,

15  monitored by the folks in North Carolina.

16             THE COURT:  All right.  Mr. Tortorice, go ahead.  And

17  I assume the government is still opposed.

18             MR. TORTORICE:  Yes, Your Honor.  And -- and, I mean,

19  just to be clear, the government's not suggesting that

20  Mr. Roseberry's mental health didn't play a role in the

21  offense.  I think it did.  I think the -- the extent to which

22  it did is maybe, you know, something the Court will likely

23  consider should we get to a sentencing phase in this case.

24         But from the government's perspective, the seriousness

25  of the crime and, frankly, the potential exposure Mr. Roseberry

1   has, argue in favor of -- of maintaining detention.  We don't
2   know that we're not going to be back in the same situation a
3   couple months from now, you know, if things don't work out the
4   way that I think; you know, if he is released everyone would
5   hope that they would.  But, you know, if he stops taking
6   medication or -- you know, various things that can happen, that
7   we might not be back right where we are.  So the government
8   still does maintain its position that detention is appropriate
9   in this case.
10              THE COURT:  Okay.  And your focus, you know -- within
11  the structure of the pretrial detention statute, your focus is
12  on safety to the public or --
13              MR. TORTORICE:  Yes, Your Honor.
14              THE COURT:  Okay.  Not a flight risk?
15              MR. TORTORICE:  I -- no, Your Honor.  I don't really
16  have any evidence that he's -- he's a flight risk in the sense
17  that he's going to abscond from having, you know, to deal with
18  the court hearing.  Now, again, if -- should Mr. Roseberry --
19  his medications, you know, change or not take them, you know, I
20  think there's a possibility short of anything could happen, but
21  I think it's a general safety to the community.
22              THE COURT:  All right.  I'm going to have to give
23  this a little bit more thought, but I will, obviously, rule as
24  quickly as possible.
25              So let's talk about a trial date.  Ms. Petras, you --

1    last time we were talking, you thought you wanted to have a
2    trial in October.  Is that right?
3              MS. PETRAS:  I think that's right, Your Honor.  My
4    schedule, as the Court knows, is packed.  I have two trials now
5    scheduled around that time.  I'd ask the Court to consider
6    making a decision on the release status.  Obviously, if he's
7    released, it puts less pressure to get it done as quickly as
8    possible.
9              And just to respond briefly to the government's
10   argument, the government is now resting its dangerousness
11   argument only on the seriousness of the offense and the
12   potential exposure.  There's a big difference on what we --
13   everyone agrees is potential exposure.  So that's not something
14   that's going to affect Mr. Roseberry's danger to the community.
15   He knows his lawyer is arguing that he should do no more time
16   and that the guidelines would support that.  So that shouldn't
17   affect the Court's decision.
18             The only question is whether or not -- the seriousness
19   of the offense, and I urge the Court to consider all of his
20   conduct in relation to the offense, where he was repeatedly
21   saying he didn't want to harm anybody.  So that mitigates that
22   somewhat.  And then on top of that, you have the medication
23   issue, you have Dr. Grant willing to be still involved, and her
24   testimony that the medications he's on now demonstrate he's not
25   a danger, and his conduct over the course of the year at the

1    jail.  He's not only not a danger to anybody, he's been helping
2    the guards, which the Court heard testimony as of last week.
3            And I forgot to mention, we tried very hard to get a
4    report of that, but, first, we didn't have a date.  And then
5    even when we got a date, by cross-referencing medical records
6    from Mr. Roseberry, who recalled going to the infirmary the
7    following day, they still had told us that they don't have a
8    report, which makes no sense.  But the Court does have the
9    essential testimony from Sergeant Moganya that it occurred and
10   he did help them.
11           So I think all of that would give the Court sufficient
12   assurance.  It's, you know, whether or not you can be
13   reasonably assured he won't present a danger to the community,
14   and I think there's a vast amount of evidence now that he will
15   not, especially given that this is the only incident in his
16   life that suggests that there was any danger.  So I'd ask the
17   Court to consider making a decision on that and then setting a
18   status hearing in early September to set the trial date after
19   we know the answer to that.
20           And, again, if the Court wanted to hear from pretrial
21   services about connecting him up with pretrial services in
22   North Carolina, I could arrange that before the release date
23   that we're suggesting of next Monday.
24              THE COURT:  Okay.  All right.  Do you have --
25   Mr. Tortorice, do you have anything to add?

1          MR. TORTORICE:  No, Your Honor.  That -- I think I
2    agree with what Ms. Petras said.
3          THE COURT:  Okay.  I think this is one I'm going to
4    have to sleep on.  So I'll think about it some more and rule as
5    quickly as practical.
6        Anything else we need to resolve today?
7          MR. TORTORICE:  Not from the government's
8    perspective, Your Honor.
9          MS. PETRAS:  Not on behalf of Mr. Roseberry.
10         THE COURT:  Okay.  I will make every effort to issue
11   a ruling by Wednesday.
12         MS. PETRAS:  Thank you, Your Honor.
13         MR. TORTORICE:  Thank you, Your Honor.
14         THE COURT:  Good-bye.
15         (Proceedings were concluded at 11:18 a.m.)

CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER


I, Nancy J. Meyer, Registered Diplomate Reporter, Certified Realtime Reporter, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenograph notes and is a full, true, and complete transcript of the proceedings to the best of my ability.


Dated this 25th day of August, 2022.


/s/ Nancy J. Meyer
Nancy J. Meyer
Official Court Reporter
Registered Diplomate Reporter
Certified Realtime Reporter
333 Constitution Avenue Northwest
Washington, D.C. 20001