```
                UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA

 * * * * * * * * * * * * * * *
UNITED STATES OF AMERICA,      )  Criminal Action
                               )  No. 21-576
vs.                            )
                               )
FLOYD RAY ROSEBERRY,           )  August 1, 2022
                               )  3:08 p.m.
             Defendant.        )  Washington, D.C.
 * * * * * * * * * * * * * * *
```

**TRANSCRIPT OF PROCEEDING
BEFORE THE HONORABLE RUDOLPH CONTRERAS,
UNITED STATES DISTRICT COURT JUDGE
(All parties appear via videoconference)**

**APPEARANCES**:


FOR THE GOVERNMENT:  CHRISTOPHER T. TORTORICE
                     DOJ-USAO
                     555 4th St NW
                     Suite 11-449
                     Washington, DC 20530
                     (202) 252-7155
                     Email: christopher.tortorice@usdoj.gov


FOR THE DEFENDANT:   MARY MANNING PETRAS
                     Federal Public Defender
                     For the District of Columbia
                     625 Indiana Avenue, NW
                     Washington, DC 20004
                     (202) 208-7500
                     Email: mary_petras@fd.org

ALSO PRESENT:        Sergeant Frederick Motanya

Court Reporter:      Elizabeth Saint-Loth, RPR, FCRR
                     Official Court Reporter

*This hearing was held via videoconference and/or
telephonically and is, therefore, subject to the limitations
associated with the use of technology, static interference, etc.*

Proceedings reported by machine shorthand.
Transcript produced by computer-aided transcription.

**P R O C E E D I N G S**

THE COURTROOM DEPUTY:  This is Criminal Action 21-576, United States of America versus Floyd Ray Roseberry.

For the United States, we have Christopher Tortorice; for the defendant I have Mary Petras.  Our court reporter today is Elizabeth Saint-Loth.  All parties are present.

THE COURT:  Good afternoon, everybody.

MR. TORTORICE:  Good afternoon, Your Honor.

MS. PETRAS:  Good afternoon.

THE COURT:  So since we were last together, the defendant has filed a motion for reconsideration of the detention order which the government has opposed.

Do the parties want to have argument on that?

MS. PETRAS:  I would like to be heard on it, Your Honor.

THE COURT:  Okay.  Go ahead.

MS. PETRAS:  Just to be clear, I don't think there is any dispute that there --

THE COURTROOM DEPUTY:  One second.

Mr. Roseberry, would you be able to put your device on mute?  The court reporter is not able to get an accurate record --

THE DEFENDANT:  You want me to mute it?

THE COURTROOM DEPUTY:  Yes, please.

1           THE DEFENDANT:  Is it muted?

2           MS. PETRAS:  There you go.

3           Okay.  I don't want to waste the Court's time and

4  repeat everything that is in the motion, just a couple of

5  points and information I have gotten in further support

6  since I have filed.

7           First of all, I don't think there is any dispute

8  that at the time of the charged offenses Mr. Roseberry was

9  under the influence of medications that were mis-prescribed.

10 He was being treated by a primary care physician for a

11 mental health condition that he knows he has and has tried

12 many times to get help for.

13          When the Court did a forensic screening, that

14 court-appointed doctor determined that he was on these

15 medications that should never -- she told -- I have spoken

16 to her since I've filed.  I have also spoken to the

17 therapist who has been working with Mr. Roseberry since he's

18 been on the unit that he's on now.  And they both say he

19 never should have been prescribed these medications; they

20 cause very bad reactions for people with his condition and

21 explains exactly what happens and why he would have done

22 something so out of character on the date of the incident.

23          I spoke to, as I said, the therapist there who

24 just says that it's remarkable how well he does there.  He

25 is fully compliant with medication; he is just a different

1   person.  She said when they first got there he was on the
2   wrong medication; they switched it.  They had to wait until
3   it got out of his system, and now he is completely compliant
4   with medication and healthy.
5           I also spoke to -- something that I don't think
6   it's ever happened in 30 years.  I had a guard from the D.C.
7   jail call me about him today; and he told me what a good guy
8   he is, and they don't think that he should be there.
9           Standing outside of the room where he is right now
10  is Sergeant Motanya who I think -- when Mr. Bos was still
11  here, he mentioned to the Court that Mr. Roseberry saved
12  him.  He was attacked by another inmate, and Mr. Roseberry
13  stepped in.  And I just spoke to, in the breakout room,
14  Mr. Motanya who is happy to speak to the Court.
15  Mr. Roseberry can have him step back in if the Court wants
16  to hear from him.  But he said nobody else would have done
17  that, but Mr. Roseberry stepped in.  He pulled the guy off
18  of him; he saved him.  The guy had broken his jaw, and God
19  knows what else -- goodness knows what else -- if
20  Mr. Roseberry had not stepped in which, again, speaks to his
21  character.
22          I understand that what happened caused a huge
23  disruption in Washington, D.C.; but I think the Court has to
24  really factor in that, one, he didn't have a device that was
25  going to harm anybody, and he actually didn't even say that

1   he was going to harm anybody.
2           There have been other cases -- I think the Court
3   may remember from years ago; it's a case I think the
4   government likes to sort of compare to this case, the man in
5   the tractor on the mall.  But that man was saying:  If you
6   don't do what I want you to do, I am going to explode this
7   bomb.  That's not even what Mr. Roseberry said even in his
8   altered state.  He was not a violent person; it is just so
9   out of his character.
10          If you listen to what he says during the whole
11  incident -- I put all of this in my motion -- but he was
12  saying he didn't want to hurt anybody.  And, in fact, he
13  didn't have the capability to.  What he had was a fake
14  device.  It was something that is not, in our view -- and I
15  don't think the government has stated a view on this yet --
16  but it does not qualify as a weapon of mass destruction.
17          So even if he's guilty of Count 2, he is not
18  guilty of Count 1.  And the guidelines for Count 2, I think,
19  are 18 months on the bottom; a sentence that he's done
20  already.  I would say -- it may be 15 months at the bottom.
21  I'm sorry, I don't have it at my fingertips.
22          I was doing something else before this, I apologize.
23          But, essentially, he has done the equivalent of
24  what his sentence would be.  But, more importantly, he is
25  not a danger to anybody, and that is the only issue for the

1    Court right now.
2            His wife can pick him up, take him directly home;
3    and he can be on home confinement -- and very safely be on
4    home confinement and comply with all of the conditions.  He
5    complies with everything at the jail and goes above and
6    beyond actually to help the guards at the jail.
7            I also spoke to the therapist there since I filed
8    my motion and my reply; she was just astounded at the fact
9    that Mr. Roseberry is still here given the clear medical
10   evidence as to what happened.
11           So for all of those reasons -- if the Court were
12   to release him, he is not a danger to anybody.  There is no
13   chance he is not going to appear and comply with all of the
14   Court's conditions; and so I'd ask the Court to release him.
15           THE COURT:  This is what I am going to do,
16   Ms. Petras.  You know, the main thrust of your argument is
17   largely scientific on the medical evidence, and I have no
18   reason to dispute your characterization of the clear medical
19   evidence.  I haven't seen any of it personally, so I will
20   let you supplement the motion with what evidence there
21   actually exists and give the government a chance to respond
22   to it.
23           Obviously, Mr. Roseberry committed a very serious
24   crime, and I am going to need some more evidence of those
25   scientific issues.

```
 1                    MS. PETRAS:  Can I just say -- I didn't re-file
 2      it, but it is before the Court in the forensic screening
 3      that was filed because it's a court-appointed doctor that
 4      said that.  I can get --
 5                    THE COURT:  Does it say anything beyond that the
 6      medicine prescribed was contraindicated?
 7                    MS. PETRAS:  That is what it says.
 8                    THE COURT:  Okay.  Yeah.  That's -- I don't think
 9      that gets you all the way there.  I mean, there are a lot of
10      medicines that are contraindicated that don't end up causing
11      people to do what Mr. Roseberry did.  I need to flesh those
12      scientific issues out some more before I would be
13      comfortable even considering doing what you are suggesting.
14                    MS. PETRAS:  I am pulling it up right now just to
15      double-check because I know that -- understood, Your Honor.
16                    I can get a letter from Dr. Grant who did that.
17                    I attempted to get a letter from Dr. Ward who is
18      obviously very busy, the doctor at the jail.  I didn't
19      receive it before this morning's hearing; I had hoped to
20      receive it this morning.  But I can get those and supplement
21      the record with it and ask the Court to schedule a hearing
22      for it.
23                    THE COURT:  Mr. Tortorice, do you have anything to
24      add to any of that?
25                    MR. TORTORICE:  No, Your Honor.  We would just
```

1  stand on our pleadings that the Court has already read.
2          THE COURT:  All right.  What else do we need to
3  resolve today?
4          MS. PETRAS:  Your Honor, I have asked the
5  government if they would agree to allow Mr. Roseberry to
6  plead to Count 2.  The plea offer currently, as it stands,
7  is to Count 1, which it is our position that he did not
8  commit.  Count 1, the guidelines -- the terrorism offense
9  enhancement applies; for Count 2, it doesn't, so it makes a
10 huge difference.
11         Our view is that he wants to accept responsibility
12 for the conduct given all of the circumstances.  So I
13 believe that if the government won't agree to that plea
14 offer we will, essentially, have to have a trial on Count 1
15 on the issue of whether or not this is a weapon of mass
16 destruction.
17         So I would ask the Court -- given that he has been
18 detained for as long as he's been detained now -- to go
19 ahead and pick a date for trial.  And I will tell the Court
20 now that it would be a trial where he's essentially
21 accepting responsibility for the conduct that he did and it
22 just doesn't meet the definition or the elements of Count 1.
23         It may be that we can agree to a bench trial or it
24 may be that we will have a very brief jury trial as to
25 Count 1; so I would ask the Court to pick a date for that.

1              THE COURT:  And is it -- I mean, the Count 1
2    issue, it sounds like it's an issue of law.  Is that
3    something that can be resolved by pleadings?
4              MS. PETRAS:  This is something -- I think the
5    Court may recall, I had another issue similar to this before
6    the Court once before; and it's very difficult to get to a
7    point where the Court can resolve an issue when the
8    government is saying something meets the offense.  I think,
9    even with that offense, it was a very close call, and the
10   Court found that it had to be a jury issue.  So my guess is
11   that that's what the jury would find here.
12             Rather than dragging this out longer of trying to
13   do that, I would rather have a very quick trial just to
14   resolve the issue.
15             MR. TORTORICE:  Your Honor, to be clear, our
16   position is that he threatened to use a weapon of mass
17   destruction, not that he did use or did even possess a
18   weapon of mass destruction.  One can threaten to use
19   something -- certainly, in this situation, where it appeared
20   to be without it actually being.  I think there have been
21   other cases similar to that.
22             So just to be clear, we're not saying that the
23   device he was holding was itself a weapon of mass
24   destruction.
25             MS. PETRAS:  Well, that's interesting.  You have

1  he threatened to use a device; and then the question is
2  whether or not the device was a weapon of mass destruction.
3  So the question is whether or not that device fits the
4  definition of a weapon of mass destruction.
5          But I think, from what the government is saying,
6  is it's not an issue that the government would agree to
7  allow the Court to resolve.
8          THE COURT:  Like he threatened solely to use the
9  device he had, he threatened to use the device that he said
10 would destroy city blocks, if my recollection serves me
11 correctly.
12         MS. PETRAS:  But that's not quite right because in
13 this case he didn't say he was going to do anything.  He
14 said that:  If you do this, this device will do that.  So
15 the correction is whether or not that is threatening to use
16 a weapon of mass destruction; there are two parts to whether
17 or not that is threatening use and whether or not it had to
18 be a device.
19         For example, there are cases that say that having
20 dynamite, which is a commercially available substance, is --
21 dynamite can't be a weapon of mass destruction because there
22 are other uses.  And the device that he had -- the materials
23 that he had was similar to that -- would not be a weapon of
24 mass destruction.
25         THE COURT:  As far as a trial date, when were you

1    thinking?  I know you guys are busy over there.
2             MS. PETRAS:  I have a trial through the beginning
3    of September, but towards the end of September or October.
4    I have a trial in October, but that trial -- we have reached
5    a plea agreement, so I can do it late --
6             THE COURT:  How many days do you think?
7             You suggested that it would be short.
8             MS. PETRAS:  I think there is a lot that we could
9    probably stipulate to, so I think we can do it in a week;
10   but I would defer to Mr. Tortorice.
11            MR. TORTORICE:  Your Honor, I certainly think that
12   it can be done within a week, particularly if it's a bench
13   trial.  Obviously, if it's a jury trial it will take a
14   little bit longer; but I think we can get it done within a
15   week.
16            THE COURT:  Ms. Petras, when is your trial in
17   September?
18            MS. PETRAS:  Well, it actually starts at the end
19   of August; but I -- so I would be available, I believe,
20   starting September 19th.  That leaves some time in between.
21            THE COURT:  Mr. Tortorice, what does that week of
22   September the 19th look like for you?
23            MR. TORTORICE:  If I can have one moment to check
24   my calendar.
25            MS. PETRAS:  I'm sorry.  I just realized something

1   else that I have.  Can we do it October 3rd?
2               THE COURT:  October is really -- (audio
3   indiscernible).
4               MS. PETRAS:  How about September 27th?
5               MR. TORTORICE:  Either of those dates work for me,
6   Your Honor.
7               THE COURT:  I have another trial scheduled for
8   October 3rd; and then I have a long, planned family vacation
9   the following two weeks.
10              MS. PETRAS:  Maybe, Your Honor, if we can set a
11  very quick turnaround date for the bond review hearing
12  because, obviously, if Mr. Roseberry is not detained that
13  would give us a lot more flexibility in setting a trial date.
14              THE COURT:  September 19th doesn't work for you?
15              MS. PETRAS:  It doesn't, Your Honor.  I'm sorry.
16  I have a family obligation.
17              THE COURT:  For that entire week or just that day?
18              MS. PETRAS:  The week.
19              Could we set a bond review hearing for Monday,
20  the 8th, if I can get a doctor's report to you by the end of
21  this week?
22              THE COURT:  August?
23              MS. PETRAS:  Yes.
24              THE COURT:  Are you available on the 8th of August?
25              MR. TORTORICE:  The government is, Your Honor.

1   THE COURTROOM DEPUTY:  I am looking at
2   availability at the D.C. jail.  The only availability at
3   D.C. jail is -- one second.
4   We can do it at 11 a.m. on Monday, August 8.
5   MS. PETRAS:  That works on behalf of
6   Mr. Roseberry.
7   MR. TORTORICE:  That works for the government,
8   Your Honor.
9   THE COURT:  All right.  Ms. Petras, do you want to
10  have the sergeant come in, or do you want to just have him
11  write something out and submit it with the other stuff?
12  MS. PETRAS:  It's been difficult getting in touch
13  with him; so if the Court is willing to hear from him now, I
14  would ask for him to step in just so the Court can hear from
15  him.
16  THE COURT:  Okay.
17  MS. PETRAS:  Can you get him, Mr. Roseberry?
18  MR. TORTORICE:  And just so we're clear, on the
19  8th we'll decide the issue of detention; and then, depending
20  on that decision, decide on trial dates or if we're going to
21  continue for another status or how we're going to proceed
22  from there?
23  (No audible response was heard.)
24  THE WITNESS:  Hello.  How are you doing?
25  THE COURT:  How are you doing, sir?

```
 1                 All right.  Mr. Tortorice, do you want him sworn
 2     in or is it okay if he just talks?
 3                 MR. TORTORICE:  It's okay if he just talks, Your
 4     Honor.
 5                 THE COURT:  Okay.  Go ahead, Sergeant.
 6                 If you can tell us -- apparently, there was an
 7     incident in which Mr. Roseberry helped you out during an
 8     incident.
 9                 MS. PETRAS:  Maybe just, for the record, if he can
10     state his full name and spell his last name?
11                 THE COURT:  Sure.
12                 THE WITNESS:  What do you want me to do, ma'am?
13                 MS. PETRAS:  Can you please state your full name
14     and spell your last name first.
15                 THE WITNESS:  My first name is Frederick,
16     F-R-E-D-E-R-I-C-K; my last name is M-O-T-A-N-Y-A [sic],
17     Sergeant.
18                 MS. PETRAS:  And then can you explain for the
19     Court what Mr. Roseberry did to help you out there?
20                 THE WITNESS:  I was working in the cell block
21     [sic]; he was one of my details, my head details.
22                 The last detail that I had, a detail to clean up
23     the whole -- hallways [sic].  So they was cleaning up; I was
24     watching them.  I see the top of the bucket.  So it
25     contact -- come at me from outside and hit me on my
```

1   shoulder, here (pointing), on the top (indiscernible) -- the
2   jaw broken, and my shoulder.  So I didn't know what hit me.
3           So when I turn around, my guard [sic] -- he
4   don't -- my guard was leaving -- my guard saw him, but he
5   was in front of me.  So he saw he hit me.  I didn't want to
6   grab him -- another thing, he grabbed him -- just came and
7   grabbed him -- like before the door was closed, they grabbed
8   him.
9           MS. PETRAS:  Just to be clear, when you say he
10  grabbed them; you mean Mr. Roseberry grabbed the man who was
11  assaulting you --
12          THE WITNESS:  Assaulting me.
13          MS. PETRAS:  -- before other officers can come to
14  help you?
15          THE WITNESS:  Yes, before they could come -- the
16  door was closed.  Everybody came out, grabbed him.  Because
17  he wanted to hit me again, wanted to hit me one more time.
18          THE COURT:  And what -- was there an incident
19  report made of the event?
20          THE WITNESS:  Yes, sir.  We have one, yes.
21          THE COURT:  Okay.  Is it possible we could get a
22  copy of that incident report?
23          THE WITNESS:  You have to inquire from the office
24  and my boss, and talk to the office (indiscernible).
25          THE COURT:  Right.

1               Ms. Petras, do you think you can get a hold of
2    that?  I am happy to issue an order if that would help.
3               MS. PETRAS:  We have been trying to get a hold of
4    it, but I am not sure.  My interns have not been successful
5    in trying to get it from the jail, so I am not sure if
6    Sergeant Motanya knows the specific person we should request
7    it from.
8               THE COURT:  Is it -- what is your boss's name we
9    should request it from?
10              THE WITNESS:  My boss here at the D.C. jail.  I am
11   not supposed to because maybe a lawsuit or something --
12              THE COURT:  Of course.  Of course.  We will work
13   on getting it.  Thank you, sir.
14              Mr. Tortorice, do you have any questions?
15              MR. TORTORICE:  No, Your Honor.
16              THE COURT:  Okay.
17              MS. PETRAS:  I have one other question.
18              Sergeant Motanya, do you remember the date of the
19   incident so that we can request it by date?
20              THE WITNESS:  I can check with the log because I
21   was out for about five -- five, six months.  I can check it
22   to make sure that I got it right.
23              MS. PETRAS:  Thank you.
24              THE DEFENDANT:  (Indiscernible.)
25              THE WITNESS:  Yes.  I want to say that we are

```
 1    thankful.  We realize that he don't need to be here.  He is
 2    different from other inmates because other inmates in the
 3    rest of facility are mean; they want you to be scared.
 4              For him to take him -- grab the guy and hold him
 5    down -- that's a nice thing.  Please look into this, okay?
 6              THE COURT:  Thank you so much, sir.
 7              THE WITNESS:  Thank you.  Thank you, Judge.
 8              MS. PETRAS:  Thank you, Sergeant.
 9              Thank you, Your Honor.
10              THE COURT:  All right.  Ms. Petras, why don't you
11    try to get ahold of that incident report; and if you need an
12    order from me, I am happy to do that if it would help.
13              MS. PETRAS:  Thank you, Your Honor.  I appreciate
14    that.
15              THE COURT:  Anything else we need to resolve
16    today?
17              MS. PETRAS:  Not on behalf of Mr. Roseberry.
18              MR. TORTORICE:  Not from the government's
19    perspective.
20              THE COURT:  And because the motion for
21    reconsideration on detention is still pending, does anyone
22    have a view that it does not toll the Speedy Trial Act until
23    the next hearing date?
24              MS. PETRAS:  I think it tolls it, Your Honor.
25              MR. TORTORICE:  Yes.  I agree, Your Honor.
```

1   THE COURTROOM DEPUTY: Judge, by what date should
2   they submit the supplement of scientific issues?
3   THE COURT: Sooner rather than later. I have
4   already given you my thoughts. The sooner you get it to me,
5   the more time all of us have to consider it.
6   MS. PETRAS: Understood. Thank you, Your Honor.
7   THE COURT: All right. Thank you, you are excused.
8   Bye-bye, Mr. Roseberry. Thank you.
9   THE DEFENDANT: Thank you, Your Honor.
10  MS. PETRAS: Thank you.
11  (Whereupon, the proceeding concludes, 3:31 p.m.)
12  \* \* \* \* \*

**CERTIFICATE**

15  I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
16  certify that the foregoing constitutes a true and accurate
17  transcript of my stenographic notes, and is a full, true,
18  and complete transcript of the proceedings to the best of my
19  ability.
20  This certificate shall be considered null and void
21  if the transcript is disassembled and/or photocopied in any
22  manner by any party without authorization of the signatory
23  below.
24  Dated this 30th day of August, 2022
25  /s/ Elizabeth Saint-Loth, RPR, FCRR
    Official Court Reporter