<div align="center">

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

</div>

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **1:21-cr-576** |
| | **:** | |
| **FLOYD RAY ROSEBERRY** | **:** | |
| Defendant. | **:** | |

<div align="center">

**GOVERNMENT'S SENTENCING MEMORANDUM**

</div>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the Government submits that a sentence of 30 months, the low end of the guidelines, and a term of supervised release of 3 years is appropriate.

I.     **Introduction**

Defendant Floyd Ray Roseberry is a 52-years old, unemployed, and resides in Grover, North Carolina.  On August 18, 2021, Roseberry left his home in Grover, North Carolina and arrived in Washington D.C. on August 19, 2021.  After arriving in Washington D.C., Roseberry drove his truck onto the sidewalk near the Jefferson Building of the Library of Congress, across from the U.S. Capitol and congressional office buildings.  While in the truck, he livestreamed video of himself on Facebook Live, making several demands—including that President Biden, then-Speaker of the House Nancy Pelosi, and other Democrats "step down"—and threatening to detonate a bomb that would destroy two-and-a-half city blocks if his demands were not met.  After a standoff lasting approximately 4 hours, Roseberry was taken into custody.

On January 27, 2023, Roseberry pled guilty to Count 2 of the indictment, which charged him with Threats to Use Explosive Material, in violation of 18 U.S.C. § 844(e). As explained

herein, a sentence of 30 months is appropriate because the defendant (1) caused the evacuation of several buildings in the Capitol complex area, including the Cannon House Office Building, the Library of Congress – the Thomas Jefferson Building and the James Madison Building – and the United States Supreme Court (all other buildings in the U.S. Capitol Complex entered a shelter-in-place status, including the U.S. Capitol Building itself); (2) caused all street traffic in the area to be diverted for approximately 7 hours; (3) demanded the resignation of government officials, and threated violence if they did not comply; and (4) suggested there were four other "Southern boys" in Washington D.C. prepared to detonate bombs if his demands were not met or if anything happened to him.  The Court must also consider that Roseberry's conduct took place just a few months after the political violence of January 6, 2021.

II.     **Factual and Procedural Background**

On August 18, 2021, Roseberry departed from Grover, North Carolina for Washington D.C.  Roseberry reached Washington D.C. the morning of the August 19, and drove his truck onto the sidewalk at First Street and Independence Avenue, NE, near the Jefferson Building of the Library of Congress, at approximately 9:45 a.m.  From there, he used Facebook Live to broadcast his grievances and threats.  He claimed that his truck's toolbox contained a Tannerite and

ammonium nitrate bomb.  He can be seen on video holding a metal cannister with what could be taken as a triggering mechanism on top.





(Top) Roseberry in his truck on the sidewalk while using his cell phone to broadcast on Facebook Live.
(Bottom) Roseberry holding meal cannister, as seen on Facebook Live

3

Roseberry's threats included the following:

a. "Hey, call the police and tell them to come out here and clear the Capitol. Tell them to clear the Capitol. Tell them to clear it. These f*****g people think I'm joking, don't they. Hey ma'am, will you call them? I've called 911 a couple times. Tell them to come out here and clear this f*****g place out. They need to clear that 'cause I got a bomb in here. I don't want nobody hurt. Yes sir, I don't want nobody hurt. I'm not coming here to hurt nobody. I'm not lying, tell them there's some more."

b. "Sir, this thing here, all I'm doing, I'm not gonna' let this bomb go off, but if these windows break, see that little speaker right there, it sets off on decimals. Clear the block, clear the block. Joe Biden, I'm not hurting nobody, but I think these flags need to go to half-staff brotha'. I'm telling you, my windows pop, this bomb is gonna go, it's made for decimals. Your military experts, that you let get their legs blown off, are the ones that built this and if you don't think its real gun powder in there boss man, there's gun powder in there this is some of the strongest shit you can get. I got two and a half pound of tannerite. Go ahead and get 'em all in the building, but I'm telling you Biden, if these windows pop this bomb goes and there's five of 'em here."

c. "If you want to shoot me and take the chance of blowing up two-and-a-half city blocks, 'cause that tool box is full, ammonium nitrate is full."

d. "'Cause I tried to call Joe Biden. Joe Biden won't talk to me. And they don't understand if this f*****g window breaks this truck goes up. They don't understand it, they think it's a f*****g joke."

e. "Joe Biden, you don't f*****g believe nothing man but this number's on you. I called your office, I called you 911 and they think it's a f*****g joke but I'm telling you bud, the South's here. These five of us spread across your little DC part here. I've done asked the people to clear the area. And the motherf*****s won't. They're still here. It's real. I'm not pulling the trigger, you are."

f. "Joe Biden, you're pulling this trigger, not me. When these windows break, it's over. Don't break these windows with no bullet cause it's not going to be my fault. It's not going to be my fault when this place goes up. You're the man. You're the man. You're the one that's going to pull the trigger. I'm not, Joe Biden. I'm not pulling the trigger on nothing."

g. "Sir, the first thing I need you to do is clear this for a two-block radius. If my windows break it goes up. Joe Biden you can stop this. You can stop this, Joe."

h. "I love this land, I love God, I love you, Joe Biden. I love you, Nancy Pelosi. Y'all need to step down. Y'all need to step down quickly cause I'm one of five that's

4

rolled into this state well this little DC.  One of five.  Joe Biden we all came a different way. There's little roadblocks on setting up coming on down here them roadblocks …. F*****g nobody. You wasted your time. Southern boys are here. You can take me out but when you do you know what's gonna' happen, Joe Biden. There's gonna' be f*****g chain reaction and that chain reaction is gonna' be on your hands when you crack a bullet through my windows."

i. "I'm ready to die for a cause, and brother if save, if you could do anything to save one life, one life, you said you'd do it.  Well, you've got a chance. I want to go home Sunday. I want to go home and see my wife. We're living in a free country, Joe.  The choice is yours.  If you want to shoot me and take the chance of blowing up two and a half city blocks, 'cause that toolbox is full, ammonium nitrate, it's full. I don't want to die, Joe, I want to go home."

j. "This blood's on your hands, Joe Biden.  We can make a deal; we can make a deal."

k. "I can't set the bomb off, Joe Biden.  The man you tell to pull the trigger the man that pulls the trigger he's the man that's gonna' set it off.  'Cause I don't want to die, Joe.  I love everybody.  It's got options.  I don't, but you do, Joe.  You got options.  I'll step out of this truck and walk away, but it's your option.  And you just gotta' remember, Joe, there's four more here.  There's four more in the capitol of D.C., sitting there just like me, but I had to be the one chosen to do the dirty work and talk.  I always get the s**t end of the deal, Joe.  Love all y'all people out here. I know what you're doing, you're protecting the Capitol, but you don't have to worry about it, I'm not gonna' blow it up.  Joe Biden is.  Nancy Pelosi.  Fifty-two Democrats.  And Joe's screaming right now, "pull the trigger pull the trigger, pull the trigger." But Joe, you don't want to do that, brother.  Do you think if I've got the balls to come up here, you think little balls hurt?  They got some home stringers out here.  I just got choose for the job.  Unlike you, this ain't about politics. This ain't got nothing to do with politics.  I don't care if Donald Trump ever become president again. Don't matter to me.  I think y'all Democrats need to step down."

l. "This is just a start.  I don't want I don't want to sit here when it blows up.  I don't want to sit here and die in this truck.  I'll die in federal prison.  You step down out of office, I'll step down out of this truck.  You go home, I'll go to federal prison. Nobody deserves to die, Joe."

*The Charges and Plea Agreement*

On September 14, 2021, a grand jury returned a two count indictment charging Roseberry with Use of a Weapon of Mass Destruction, in violation of 18 USC § 2332(a)(2)(A)&(C) and Threats to Use Explosive Material, in violation of 18 USC § 844(e).  On January 27, 2023, the defendant pled guilty Count 2 of the Indictment.

5

III.     **Statutory Penalties**

Roseberry now faces a sentencing for violating 18 U.S.C. § 844(e). As noted by the plea agreement and the U.S. Probation Office, the statutory maximum penalties for this conviction are 10 years of imprisonment; a fine of $250,000 or twice the pecuniary gain or loss of the offense, pursuant to 18 U.S.C. § 3571(b)(3) & (d); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2); and mandatory restitution, pursuant to 18 U.S.C. § 3663A.

IV.     **Guidelines Calculations**

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point" for determining a defendant's sentence. *Id.*

Here, as the PSR correctly calculates, the applicable Guidelines and Criminal History Category are as follows:

a.   Base offense level of **12**, pursuant to 2A6.1(a)(1);

b.   An increase of **4** levels pursuant to 2A6.1(b)(4);

c.   An increase of **6** levels pursuant to 3A1.2(a)(1) and (2);

d.   A decrease of **3** levels for acceptance of responsibility pursuant to 3E1.1(a) and (b);

e.   A total offense level of **19**; and

f.   Criminal History Category **I**

PSR ¶ 21-34.

Based on assessments conducted by D.C. Detention Facility medical personnel and psychiatric experts hired by the defendant, the Government acknowledges that Mr. Roseberry was

suffering from psychiatric conditions that contributed, in large measure, to his criminal activity. The Government further acknowledges that the medication he was prescribed and took as directed by his doctor shortly before committing the offense likely exacerbated his conditions. Consequently, a departure pursuant to §5K2.13 (Diminished Capacity) could apply.  To the extent the Court agrees that such a departure is applicable, the Court should equally consider that the Government elected not to pursue a trial on Count 1 of the indictment.[1]  Had the Government pursued Count 1, the Defendant could have been subject to the terrorism enhancement under §3A1.4, raising his guidelines to an estimated 210-262 months (Offense Level 32, Criminal History Category VI).  The Government submits that Mr. Roseberry has already received the benefit of his diminished capacity by virtue of his plea to Count 2 and not facing the full force of the indictment.

V.      **Sentencing Factors Under 18 U.S.C. § 3553(a)**

Sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 30 months incarceration and 3 years of supervised release.

---

[1]  Mr. Roseberry was charged in Count 1 with a violation of 18 U.S.C. § 2332(a)(2)(A)&(C).  This charge carries a significant penalty.  If convicted, Mr. Roseberry would have faced a term of imprisonment up to life, a fine up to $250,000 and a term of supervised release up to 5 years.

### A.  The Nature and Circumstances of the Offense

Mr. Roseberry's actions were serious and caused significant disruption to governmental functions.  Mr. Roseberry effectively threatened the lives of hundreds of government officials and others working in surrounding buildings based in part on a political agenda just a few months after the attack on the U.S. Capitol on January 6, 2021.  His actions caused the evacuation of several governmental offices, including the Cannon House Office Building, the Library of Congress – the Thomas Jefferson Building and the James Madison Building – and the United States Supreme Court.  Additionally, traffic in the Capitol Complex area was diverted for approximately 7 hours.

Given the obviously serious nature of the threats, the circumstances of the offense argue for a sentence within the applicable guideline range, 30-37 months.  If one were to imagine the various scenarios in which a person could threaten to use an explosive device, it would be difficult to imagine one more serious than threatening to detonate a device capable of destroying a two-and-a-half block radius around the Library of Congress.  Aside from the previously mentioned buildings, a two-and-a-half block radius of the Library of Congress includes the Cannon and Longworth House Office Buildings, the U.S. Capitol, the Capitol South Metro station, the Republican National Committee headquarters, the Democratic National Committee headquarters, two churches and an apartment building, among other businesses and attractions.

While the Government does not dispute that Mr. Roseberry's psychiatric condition at the time of the offense heavily contributed to his behavior, the Government took this into consideration at the time of the plea.  The Government could have pursued a plea to (or trial on) Count 1, Use of a Weapon of Mass Destruction, which would have resulted in a much more significant guideline calculation, but instead agreed to a plea to Count 2, in part due to Mr. Roseberry's psychiatric

condition and the specific circumstances here regarding his use of new medication as directed by a doctor shortly before committing the offense.

Accordingly, the nature and the circumstances of this offense establish that a guideline sentence of 30 months incarceration and a term of supervised release of 3 years is appropriate.

### B.  The History and Characteristics of Mr. Roseberry

As set forth in the PSR, Mr. Roseberry has no significant criminal history, aside from a theft conviction in 1989, when he was 17 years old. ECF 31 ¶¶ 32.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

Mr. Roseberry's sentence should not only reflect the disruption he caused, but should also account for the nature of the threat. The victim of Mr. Roseberry's threats were high-ranking government officials. He demanded President Biden and then House Speaker Nancy Pelosi resign from office. The purpose of his threats, however unlikely, was to remove elected officials from office.  While the desired goal was unlikely to come to pass, the sentiment behind his actions—to use threats of violence to sway the functions of government—must be met with significant punishment.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

The need for general deterrence weighs heavily in favor of incarceration.  It must be made clear that threats of violence designed to shape the function of the government will be met with harsh punishment.  As we have seen with many of the January 6 related defendants, courts have

looked harshly upon those attempting to disrupt democratic processes.  While Mr. Roseberry's direct motivation may not have been the certification of the 2020 election results, it was nonetheless political in nature, and should be seen as no less damaging to a healthy democracy than any individual January 6 defendant.  The court should do all in its power to thwart political violence, or even the threat of political violence, regardless of its form.

### E.       The Need to Avoid Unwarranted Sentencing Disparities

The set of facts presented by this case are unusual, but not unpresented in this district. Specifically, the facts of United States v. Dwight Watson (1:03-cr-146) are quite similar.  In March 2003, Mr. Watson drove his tractor from North Carolina to Washington D.C. in order to express various political grievances.  He drove his tractor into the pond in Constitution Gardens, within the National Mall.  There, Mr. Watson made his grievances known and claimed to have a bomb. Mr. Watson, similar to Mr. Roseberry, said that he did not want to hurt anyone, but was willing to die for his cause. Mr. Watson made a list of conditions to be met before he would leave the National Mall, including an appearance with Matt Lauer and Katie Couric on the Today Show, a conversation with Jesse Ventura, and the presence of the 82nd Airborne Division on the Mall. After a two day standoff, Mr. Watson surrendered and was taken into custody.  A search of his tractor revealed no bomb.  Mr. Watson was tried and convicted of threatening and conveying false information concerning the use of an explosive in violation of 18 U.S.C. § 844(e) and destruction of government property in violation of 18 U.S.C. § 1361.  After several sentencing delays due to the Court's concerns about Mr. Watson's mental health, Judge Thomas Jackson sentenced Mr. Watson to 72 months' incarceration[2].

---

[2] Judge Jackson's sentence was at the high end of the then-mandatory guideline range.  Exactly one week after Mr. Watson's sentencing, the United States Supreme Court decided *Blakely v. Washington* 542 U.S. 296 (2004).  Mr. Watson's sentence was vacated as a result, and he was

Here, Mr. Roseberry's conduct and circumstances surrounding the offense are principally the same as Mr. Watson's. Both defendants parked their vehicle in or near government property, near the actual and symbolic seat of the U.S. federal government, and made political demands that, if not met, would result in the detonation of the explosive devices they claimed to have. Both incidents caused significant public disruption and required the expenditure of substantial governmental resources to address the threats. Additionally, both defendants appeared to be suffering from psychiatric conditions at the time of their offenses.

---

resentenced to 16 months—effectively a sentence of time served. The Government appealed the 16 month sentence and the Court of Appeals reversed and remanded for resentencing. Approximately 4 years later, Mr. Watson was resentenced again, this time by Judge Hogan. At sentencing, the Court expressed a belief that Mr. Watson's conduct warranted a guideline sentence of 53-61 months, but declined to send Mr. Watson back to prison after being out of custody for nearly 4 years without incident.

VI.     **Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 30 months incarceration and 3 years of supervised release. Such a sentence protects the community, promotes respect for the law, and deters future crime, while recognizing the impact of Mr. Roseberry's psychiatric condition at the time of the offense and his acceptance of responsibility.

<div style="margin-left:40%">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     /s/ Christopher Tortorice_____
        Christopher Tortorice
        Assistant United States Attorney
        Texas Bar Number 24048912
        National Security Section
        601 D Street, N.W.
        Washington, D.C.  20530
        Office: (202) 252-7155
        Christopher.Tortorice@usdoj.gov

</div>

## <u>CERTIFICATE OF SERVICE</u>

On this 1st day of September , 2023, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

<u>/s/Christopher Tortorice</u>
Christopher Tortorice
Assistant United States Attorney
Texas Bar Number 24048912
National Security Section
601 D Street, N.W.
Washington, D.C.  20530
Office: (202) 252-7155
Christopher.Tortorice@usdoj.gov