UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| v. | : | 21-CR-576 (RC) |
| **FLOYD RAY ROSEBERRY** | : | |

### DEFENDANT'S MOTION
### FOR DOWNWARD DEPARTURE AND SENTENCING MEMORANDUM

On January 27, 2023, Floyd Ray Roseberry entered a guilty plea to threats to use explosives, in violation of 18 U.S.C. § 844(e). He will appear before this Honorable Court for sentencing on August 18, 2023. As set forth in the Presentence Investigation Report ("PSR"), the recommended sentencing range under the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") is 30 to 37 months of incarceration. A downward departure from that range pursuant to U.S.S.G. § 2K2.13 is appropriate due to Mr. Roseberry's diminished capacity at the time of the offense. A sentence of time served (12 months) would appropriately account for Mr. Roseberry's diminished capacity at the time of the offense and would be sufficient but not greater than necessary to serve the purposes of sentencing.

### Factual Background

Mr. Roseberry is 51 years old and has suffered from mental health disorders since he was a teenager. His only prior conviction was a misdemeanor offense (misdemeanor larceny) that he committed when he was 17 years old.

While he was growing up in North Carolina, his father was an alcoholic and abusive to him, his mother, and his sister. When Mr. Roseberry was fourteen years old, he dropped out of school and left home to survive. He was homeless for a short time, then his aunt and uncle found him and brought him to live with them.

At the age of fifteen, he began working in a cotton mill for Ithaca Industries in Gastonia, North Carolina. He worked there for more than ten years, until the factory closed. He then earned his GED and went back to school at Cleveland Community College. He took three years of college courses and graduated with an associate degree and certified in welding, CAD, and blueprint reading.

Unfortunately, not long after graduation, he was shot in his arm during a dispute with his brother-in-law, while protecting his sister. His arm was severely damaged, and he was unable to use it or move his fingers. This struggle contributed to the deterioration of his mental health.

He has been seeing therapists and mental health providers since he was a teenager. When he was a young adult, he was diagnosed with bipolar disorder and PTSD from the trauma he suffered as a child. Approximately 15 years ago, he was placed on disability for both his physical and mental limitations. Over the years, Mr. Roseberry continuously has struggled to find and maintain adequate care in his small community. Many doctors leave the area for better opportunities, and hospitals have limited resources.

Mr. Roseberry has one son with his first wife. His son is now 25 years old and has a daughter of his own. In 2013, Mr. Roseberry married his current wife, who works as a quality manager for a metal machine shop. The couple live on a seven-acre property and raise goats and other farm animals. His wife has consistently helped Mr. Roseberry maintain his medication regimen and seek help when prescribed medications are not adequate. Their lives were stable for many years until they experienced several losses in a short period of time.

In 2017, Mr. Roseberry's mother was diagnosed with cancer, and after a long struggle, she died in 2018. The following year, his father-in-law died after having a heart attack. A few

months later, his uncle and aunt both died. His uncle died from heart failure, and his aunt died soon after from what Mr. Roseberry describes as "the grief."

Coping with all this loss in a short period of time was very difficult for Mr. Roseberry, who was struggling to maintain his mental health. By summer 2020, Mr. Roseberry was suicidal, and his wife called the suicide hotline to get help. Authorities took Mr. Roseberry to a local hospital but were told the hospital did not have room for him. Authorities then took him to a facility in Winston-Salem, North Carolina. This facility also did not have the resources to treat Mr. Roseberry. Mr. Roseberry returned home and later saw his primary care physician, who prescribed medication to address his mental health. At first, the medication seemed to work, but symptoms returned a short time later. The physician changed the medication several times with little success.

Not long before Mr. Roseberry's arrest, the doctor changed the medication again. Unfortunately, the doctor prescribed medication that was Adderall and Valium. Mr. Roseberry and his wife, who trusted that the doctor knew what was best, were unaware that he should not be taking this medication with his condition. Mr. Roseberry's wife confirms that Mr. Roseberry took the medication as directed until the date of his arrest—she made sure he did. They learned that the prescribed medication was contraindicated for his condition only after his arrest and evaluation at the District of Columbia Central Detention Facility (D.C. Jail).

With a significantly impaired mental condition due to this medication, on the date of the charged offenses, August 19, 2020, Mr. Roseberry woke up, drove from his home in North Carolina to Washington, D.C. and parked on the sidewalk in front of the Library of Congress. He remembers very little of the events of that day, but he broadcasted live video and audio of the

events on Facebook. The government preserved those recordings.

On the recordings, Mr. Roseberry is seen claiming to have a bomb and a detonator in his possession. His statements made little sense, but he claimed that if the police shot at him, the bomb would explode. He repeatedly said that he did not want to hurt anyone, but that the bomb would explode if he was shot. He made vague references to a revolution, said he wanted to speak to President Biden, and demanded that President Biden and Speaker of the House of Representatives, Nancy Pelosi, resign.[1] While in the truck, Mr. Roseberry was holding an old, rusted metal can that appeared to be fashioned into an explosive device, but it was not an explosive device. There was no detonator, only molding clay and parts of fishing equipment. After the can was recovered, it was found to contain a small amount of smokeless powder, considered a low explosive. The device was not capable of detonating by any means.

After his arrest, on August 20, 2022, Mr. Roseberry was presented before Magistrate Judge Zia Faruqi. The government requested a competency screening, and the defense did not object. Teresa Grant, Ph.D., a licensed clinical psychologist with the D.C. Department of Behavioral Health, evaluated Mr. Roseberry and on August 25, 2021, submitted a report finding that Mr. Roseberry was not competent. Dr. Grant noted that she conferred with the Director of Mental Health Services at the D.C. Jail, and she and jail staff had concerns about

---

[1] The Statement of Offense indicates that Mr. Roseberry "stated that he was upset about the 2020 election results." ECF 26 at 2. As noted above, Mr. Roseberry does not recall much about the date of his arrest, but he does not dispute the government's evidence. Counsel notes, however, that a review of the videos of the charged offense demonstrates that Mr. Roseberry did not say he was upset about the election, although he made the statements noted above. Moreover, as Dr. Michael Thase reports, "When asked about his feelings about the 2020 election results, he said, 'that's the odd thing – I wasn't a big Trump supporter, and I wasn't upset at the time of the election with the results.'" *See* Report by Michael E. Thase, M.D., submitted under seal.

Mr. Roseberry's prescribed medications. The medical staff at the jail prescribed a different medication regimen than that prescribed by Mr. Roseberry's doctor in North Carolina.

Several weeks later, Dr. Grant re-evaluated Mr. Roseberry and on September 20, 2022, submitted a report finding that Mr. Roseberry had been restored to competency. Dr. Grant also confirmed that Mr. Roseberry's medication prior to his arrest had been prescribed by his primary care physician, not a psychiatrist—as noted above, Mr. Roseberry struggled to find psychiatric care in his small town. In her report, Dr. Grant noted that the medications prescribed were contraindicated for persons with Mr. Roseberry's diagnosis.

On August 8, 2022, at a hearing before this Court on Mr. Roseberry's appeal of the magistrate's detention order, Dr. Grant testified that she was shocked when she learned that Mr. Roseberry had been prescribed Adderall and Valium and shocked that those medications were prescribed by his primary care physician, not a psychiatrist. ECF 21 at 3. Dr. Grant explained that the medications can contribute to manic and psychotic episodes in persons with Mr. Roseberry's diagnosis. *Id.* at 4. She testified that she thought "that that's exactly what happened [to] Mr. Roseberry prior to him driving from North Carolina to the Capitol on the day that he [was arrested]. *Id.* She testified that she consulted with the psychiatrist at the D.C. Jail and that he agreed with her regarding the medications that Mr. Roseberry had been prescribed and started him on a new medication regimen. *Id.* at 4-5. Dr. Grant also noted that after Mr. Roseberry reported some lingering problems on his medication regimen at the jail, medical staff again adjusted the medication, and the adjustments were effective. Dr. Grant testified that Mr. Roseberry has been stable since this medication regimen was changed.

On August 15, 2022, after several hearings, the Court released Mr. Roseberry to home

confinement. Before his release, he was detained at the D.C. Jail for a year, and consistent with his true personality, Mr. Roseberry's behavior was exemplary. Not only did he follow the rules as required, but he also stepped in and rescued guards when other inmates threatened or assaulted them. As a result, he endured abuse from other inmates, including having urine and feces thrown on him for being "the police." At an August 1, 2023, hearing before this Court on Mr. Roseberry's appeal of the detention order, one of the D.C. Jail guards that Mr. Roseberry assisted spoke to the Court and attested to Mr. Roseberry's assistance and good character. ECF 23 at 17.

Like his behavior at the jail, Mr. Roseberry's conduct on release has been exemplary. He has strictly followed all the conditions of release, with no reports of any issues or violations. As a result, with the consent of the government, on June 23, 2023, the Court modified his conditions of release to require only standalone GPS monitoring with a curfew. Mr. Roseberry has been spending much of his time supporting his wife and accompanying her to medical appointments because she has been diagnosed with cancer.

On January 27, 2023, Mr. Roseberry entered a guilty plea to Count Two of the indictment, charging him with threatening and conveying false information concerning an attempt or alleged attempt made unlawfully to damage or destroy a building by means of fire and an explosive, in violation of 18 U.S.C. § 844(e) (Count Two). He deeply regrets his conduct, but the conduct is not reflective of who he is. His behavior was an aberration, out of character, and the result of the prescribed medication that induced a psychotic state.

**Argument**

**I. MOTION FOR DOWNWARD DEPARTURE**

Section 2K2.13 of the Guidelines provides in relevant part:

> A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. Similarly, if a departure is warranted under this policy statement, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

A "significantly reduced mental capacity" is defined as "a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." *Id*. at Appl. Note 1.

Here, a departure under § 2K2.13 is warranted. As confirmed by Dr. Grant and by the report (filed under seal) from his current treatment provider, Christopher Bradley, DMS-c, PA-C, Mr. Roseberry suffers from bipolar disorder. At the time of the charged offense, his primary care physician had prescribed Adderall and Valium. As Dr. Grant testified, this medication is contraindicated for individuals suffering from bipolar disorder. Dr. Grant's testimony is confirmed by the fact that the psychiatrist at the D.C. Jail immediately changed Mr. Roseberry's medication regimen, and Mr. Roseberry has been stable since those changes were made.

Counsel also has submitted, under seal, the expert report prepared by Michael E. Thase, M.D., Professor of Psychiatry at the University of Pennsylvania. In addition to interviewing Mr. Roseberry, Dr. Thase reviewed the videos of the charged conduct, Mr. Roseberry's medical records, Dr. Grant's report, and the statement of Mr. Roseberry's current mental health provider. Dr. Thase concluded:

7

> It is my opinion, to a reasonable degree of medical and psychiatric certainty, Mr. Roseberry is now correctly diagnosed as having Bipolar Affective Disorder and that, with this information in hand, it is clear Mr. Roseberry was not receiving appropriate treatment in the months leading up to the events in Washington, D.C. I likewise conclude that the events of August 2021 – including his statements and demeanor during the broadcasts - are best described as the acts of a person in the midst of an episode of mania. It seems likely that this episode was, at least in part, triggered by the combination of several psychiatric medications that were prescribed by his PCP, who did not realize that Mr. Roseberry had Bipolar Affective Disorder. I therefore conclude that, from a psychiatric standpoint, the criteria for "downward departure" in the severity of the sentence have been met. Namely, it is clear that: 1) Mr. Roseberry committed the crime while suffering from a significantly reduced mental capacity as a consequence of a psychotic episode and (2) the resulting reduction in mental capacity associated with this manic episode contributed substantially to the commission of the crime.

In short, Mr. Roseberry went to the Library of Congress and made the statements he made only because he was suffering from a psychotic state induced, at least in part, by prescribed medications. Thus, the indisputable facts support a diminished capacity departure.

Counsel notes that the Probation Office states, without support, that a departure is not warranted because there is a need to protect the public because the offense involved "a serious threat of violence," citing U.S.S.G. § 5K2.13(2). PSR at 17-18. This exclusion applies only if a "serious" threat was made and there is a need to protect the public. The Probation Office does not offer support for its statement or address the fact that Mr. Roseberry had no explosive devices or means of causing harm, and therefore, made no "serious" threat. Moreover, Mr. Roseberry not only has no history of violence, but repeatedly stated during the offense that he did not want to harm anyone. There are no facts to support a finding that the public needs protected from Mr. Roseberry, who has been on release for more than a year without incident.

8

The Probation Office does not address any of the facts of this case. The Court is required to do so. *See United States v. Sam*, 467 F.3d 857, 862 (5th Cir. 2006). The facts of this case do not support a finding that the public needs protected from Mr. Roseberry or that he made a serious threat. For these reasons, the Court should reject the Probation Office's position.

The Guidelines provide that "if a [diminished capacity] departure is warranted . . ., the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense." U.S.S.G. § 5K2.13, Appl. Note 1. Here, Mr. Roseberry's reduced mental capacity was the sole cause of the offense. He would not have traveled to the District of Columbia or made the statements he made if he had not been suffering from a diminished mental capacity. For this reason, the maximum possible departure is appropriate. Everything about Mr. Roseberry's behavior prior to the offense and after his medication was corrected supports such a finding. Mr. Roseberry served 12 months incarceration at the D.C. Jail, and an 18-month departure from the bottom of the Guidelines range (30 months) to time served is appropriate given the relationship between Mr. Roseberry's mental health and the offense.

## II. SECTION 3553(a) FACTORS

When imposing a sentence, the Court must consider several factors, including the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence to criminal conduct; and the United States Sentencing Guidelines. *See* 18 U.S.C. § 3553(a); *United States v. Booker*, 543 U.S. 220, 259 (2005). These factors also support a sentence of time served and additional term of incarceration would be greater than necessary to serve the purposes of sentencing. *See* 18 U.S.C.

§ 3553(a) (court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]" (emphasis added)).

   a. **The United States Sentencing Guidelines**

When sentencing a defendant, the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007). Rather, the Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the Court to consider. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). Once the Court correctly calculates the sentence that the Guidelines recommend, the Court must then "make an individualized assessment," considering the remaining factors set forth in § 3553(a). *Gall*, 552 U.S. at 50. Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it. *Rita v. United States*, 551 U.S. 338, 348, 350 (2007). Consequently, this Court must "filter the Guidelines' general advice through § 3553(a)'s list of factors." *Id*. at 358; *see also Gall*, 552 U.S. at 52 ("'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996))).

When considering the Guidelines in this case, the Court should consider that, although the Guidelines were created to promote uniformity in sentencing, the Guidelines also specifically recognize that there are exceptions when a sentence within the recommended range is not appropriate. As noted above the diminished capacity exception applies here, and for that reason

10

alone, a sentence within the recommended range would be greater than necessary to serve the purposes of sentencing.

  b. **The Nature and Circumstances of the Offense**

There is no doubt that on August 19, 2021, Mr. Roseberry acted recklessly and made false threats. Law enforcement, not knowing that the threats were false, in turn, responded in a manner necessary to protect the lives and property in the area in the event the threat was real. This caused a significant disruption to law enforcement and others in the area. Mr. Roseberry, however, did not have the capacity to harm anyone—because he had no destructive device—and had no intent to harm anyone. Mr. Roseberry is not a violent person, and even in his psychotic state, repeatedly said that he did not want to harm anyone.

  c. **History and Characteristics of Mr. Roseberry**

As set forth in greater detail above, Mr. Roseberry is 51 years old and has been a law-abiding and productive citizen for decades. The instant offense arose out of a psychotic state induced by medication that should not have been prescribed to him given his mental health condition. Absent that unique circumstance, Mr. Roseberry is no danger to anyone, but rather a loving and law-abiding husband and father.

Mr. Roseberry's true character is demonstrated not only by the life he led for nearly 50 years prior to his arrest, but also by his conduct following his arrest. The testimony by the D.C. Jail guard and the August 1, 2022 hearing before this Court was extraordinary—few inmates earn such respect from detention officers. Mr. Roseberry's conduct while on release for more than a year further confirms his true character.

### d. The Purposes of Sentencing

Mr. Roseberry was detained at the D.C. Jail for 12 months following his arrest in August 2021. After his release in August 2022, he has served nearly a year on home detention—a significant punishment in itself. Prior to this case, Mr. Roseberry never experienced incarceration or home detention. Both incarceration and home detention have been impactful.

Because the offense occurred due to the medication Mr. Roseberry was taking, imposing a sentence for the purpose of individual or general deterrence is not appropriate. Mr. Roseberry does not need to be deterred because, absent contraindicated medication, he does not commit crimes, and generally deterring people like him (who do not commit crimes when they are not in a medication-induced psychotic state) is not necessary. The time at D.C. Jail and on home detention has been sufficient to impress upon Mr. Roseberry the need to obtain and comply with mental health treatment—which he has done since his release. The combination of the period of detention at the D.C. Jail, home detention, and supervised release also would be sufficient to act as general deterrence given the unique circumstances of this case.

Additional incarceration is not necessary to reflect the seriousness of the offense or promote respect for the law. Mr. Roseberry's conduct was not a flagrant violation of the law, but rather based in his mental health disability—a temporary lapse, rather than a demonstration of disrespect for the law. Moreover, the Court can impose punishment without incarceration by substituting conditions of supervised release. A sentence of probation or supervised release itself is a "'substantial restriction of freedom.'" *Gall*, 128 S.Ct. at 595 (citation omitted). As the Supreme Court has explained:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders

>on probation are nonetheless subject to several standard conditions that substantially restrict their liberty. *See United States v. Knights*, 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled' " (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987))). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court.

*Id*. at 595-96 (footnote omitted). By structuring a sentence that does not involve additional incarceration, the Court can both serve the purposes of sentencing and ensure Mr. Roseberry continues to obtain the appropriate medical treatment he needs to continue the law-abiding life that he led before he was prescribed medication that induced a psychotic state and has continued to lead since his release more than a year ago.

   e. **Jurisdiction**

The Probation Office asks that the Court transfer jurisdiction of this case to the Western District of North Carolina, where Mr. Roseberry lives. Mr. Roseberry respectfully requests that the Court transfer only supervision, not jurisdiction to North Carolina. Based on several hearings and all of the pleadings filed in this case, this Court has familiarity not only with the facts of the charged offense, but also Mr. Roseberry's history, condition, and compliance. There is no reason why this Court cannot handle any issues that arise post-sentencing as expeditiously as a Court in North Carolina.

**Conclusion**

For the foregoing reasons and such other reasons as may be presented at the sentencing hearing, Mr. Roseberry respectfully requests that the Court impose a sentence of time served and a period of supervised release.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____
MARY MANNING PETRAS
Assistant Federal Public Defenders
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C. 20004
(202) 208-7500 ext. 5109